UNITED STATES *v.* SHEEPSHEARERS MDSE. & COMM. CO. (No. 3524)[1]

United States Court of Customs and Patent Appeals, December 19, 1932

*Charles D. Lawrence,* Assistant Attorney General (*John F. Kavanagh,* special attorney, of counsel), for the United States.
*James W. Bevans* for appellee.

[Oral argument October 5, 1932, by Mr. Lawrence and Mr. Bevans]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

The merchandise here involved was imported through the port of New York while the Tariff Act of 1922 was in force by Sheepshearers Merchandise & Commission Co. "of Butte, Montana." The consular invoices designated it as "agricultural implements." The local appraiser described it by notations on the respective invoices as "Blades for animal clippers." The collector of customs classified it and assessed duty upon it under paragraph 357 of Title I of the aforesaid tariff act. The importer protested, claiming it duty free as agricultural implements under paragraph 1504, appearing in Title II of said act. In the letter or "report" of the collector referring the issue to the United States Customs Court for determination appears the statement "on wide combs and wide cutters."

The trial court sustained the protest, and the Government appealed the suit to this court.

Samples are on file as exhibits in the case. These comprise two separate articles, one referred to as a comb and the other as a cutter. They are for use in what is generally referred to as a sheepshearing machine, the machine being a device for the operation of which power is usually supplied by either electricity through the medium of a motor, or by a gasoline engine through the medium of a belt. By proper gearing the power for operation can be produced and transmitted by the turning of a crank by hand. The complete machines for operation in the last-named manner are probably of smaller dimensions than those made for operation by electric or belt power. The combs and cutters at issue are for the larger type of machine.

There is no question made as to these being parts for a device which is used for shearing sheep and not used for clipping other animals. In other words, the exclusive use of the articles whose classification is in issue is for shearing sheep.

The piece referred to as a comb consists of a metal plate about 3½ by 2½ inches over all, and one-eighth inch thick, having a series of points or teeth—13 in number—sloping from base to outer end, and spaced at the outer end about one-fourth inch apart. The cutter is a metal part having four teeth, spaced about three-fourths inch apart at their outer ends. Over all, it is about 3½ by 1½ inches, hollowed on the under side and slightly curved at its base.

In operation the comb is rigidly attached by screw bolts to the end of a device which seems to be designated as a hand piece, or "shearing hand piece," and the cutter is attached by means of another device in a manner which leaves it free to slide back and forth, or oscillate, across the stationary comb when power is applied and thus shear the fleece from the sheep. The part, or hand piece, which holds the comb and cutter must be directed by the human hand.

The pertinent part of paragraph 357 of the Tariff Act of 1922, under which the collector classified the merchandise, reads:

PAR. 357. Nail, barbers', and animal clippers, pruning and sheep shears, and all scissors and other shears, and blades for the same, finished or unfinished, valued at not more than 50 cents per dozen, 3½ cents each and 45 per centum ad valorem; valued at more than 50 cents and not more than $1.75 per dozen, 15 cents each and 45 per centum ad valorem; valued at more than $1.75 per dozen, 20 cents each and 45 per centum ad valorem; * * *.

Paragraph 1504, under which appellee claims, is in full as follows:

PAR. 1504. Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins, machinery for use in the manufacture of sugar, wagons, and carts, cream separators valued at not more than $50 each, and all other agricultural implements of any kind or description, not specially

provided for, whether in whole or in parts, including repair parts: *Provided*, That no article specified by name in Title I shall be free of duty under this paragraph.

The contention is made in the Government's brief that "animal clippers" and "sheep shears" are synonymous with "sheep-shearing machines," because "clipping and shearing are interchangeable terms and mean the same thing"; that the "combs" and "cutters" involved perform the same function as "blades" in sheep shears; that they are known in the trade as blades; that they are blades in the common meaning of the term, and that it would be a "patent absurdity" to levy duty on instruments used by hand power (the ordinary and familiar sheep shears) to clip hair from sheep and on animal clippers, such as clippers for horses, mules, dogs, and cattle, while admitting duty free "parts of machines" used for shearing sheep. It is also argued that the wool of the sheep is the hair of the sheep. Hence the Government insists the articles are such "blades" as are "specified by name" in paragraph 357, *supra*, and, therefore (even though used for an agricultural purpose, as defined by this court in *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T. D. 35472, and followed in *United States* v. *Irwin & Co.*, 7 Ct. Cust. Appls. 360, T. D. 36906), are forbidden classification as agricultural implements by the proviso of paragraph 1504, *supra*.

Appellee insists that there is a distinction in fact between wool and hair, recognized and made a legal distinction, in a tariff sense, by the Tariff Act of 1922 itself; that the record establishes that long prior to and at the time of the passage of said act three distinct types of implements for the purpose of removing wool and hair from sheep and other animals "were known in the trade," viz, (1) sheep shears (being the familiar hand implements), (2) clipping machines for horses, dogs, mules, and cattle, and (3) sheepshearing machines used solely for the shearing of sheep; that the clipping machines for horses, dogs, mules, and cattle and machines for shearing sheep "could not be used interchangeably," being "separate and distinct types of implements"; that sheepshearing machines which are power machines would be excluded from paragraph 357, in view of the inclusion therein of hand shears, under the doctrine of *expressio unius est exclusio alterius;* that sheepshearing machines being so excluded and being duty free as agricultural implements, the combs and cutters for same are likewise duty free as parts of such implements, and, as the leading point, asserts that by the record—

It is conclusively shown that the imported articles are commercially known as combs and cutters and not as blades, and that they were so known long prior to and at the time of the enactment of the Tariff Act of 1922.

In the opinion of the trial court there is no discussion of the common meaning of such terms as "animal clippers," "sheep shears," and

"blades for same," which are "specified by name" in paragraph 357, *supra*, and its decision seems to have rested solely upon commercial designation.

The court said:

While much of the evidence was introduced with a view to proving the existence in trade on and prior to September 21, 1922, of three different classes of articles which were separately and distinctly known and recognized commercially as sheep shears, sheepshearing machines, and clipping machines, respectively—the sheep shears being confined to hand tools, the sheepshearing machines being exclusively employed in shearing sheep and the clipping machines being used for clipping the hair from horses, mules, cows, dogs, and cattle—nevertheless, as we view the issue, the single question presented is whether or not these combs and cutters are commercially known as blades. This seems to be of the very essence, because in naming blades only, and refraining from mentioning any other parts, Congress must have deliberately intended to exclude from paragraph 357 all parts, save blades, of the articles denominated in the paragraph. *Expressio unius est exclusio alterius.*

Upon this question of commercial designation appellee called two witnesses and the Government two. Through these respective witnesses and by stipulation as to the testimony of another there were introduced various catalogues and pages from catalogues illustrating, describing and advertising (a) ordinary sheep shears, (b) clippers, both hand operated and power operated, for horses, mules, cattle, and dogs and parts of same, and (c) shearing machines of the power type for sheep and parts of same corresponding to the articles at issue.

So far as the documentary evidence alluded to is concerned, all that portion of it which is found to be competent shows that the articles here involved are, and were prior to and at the time of the passage of the Tariff Act of 1922, designated therein as combs and cutters. This appears in six different catalogues or pages taken from catalogues, issued by five different manufacturers of, or wholesale dealers in, such articles. There is no exception to this designation.

These same catalogues show that the power-operated sheep-shearing devices, taken as entireties, are referred to as "sheepshearing machines," while the power-operated clippers, taken as entireties, are listed and illustrated separately, being designated variously by such terms as "fetlock clippers," "hand-power clippers for horses, cows, and mules," "one-man power clipping machine," and "horse and cow clipping machine."

These catalogue illustrations and descriptions show that, as a rule, the cutting parts in clippers for horses, mules, cattle, and dogs are referred to as "plates." In one or more instances "knives" are used, but nowhere, as to either shearing-machine parts or clipping-machine parts, do we find the word "blade" or "blades."

In at least one place reference is made to "one-man power shearing machine." This is followed by the statement: "All parts necessary to change your shearing machine for clipping included."

The first witness called for appellee was Mr. Chas. F. Wiebusch, whose company "are manufacturer's representatives," and, as such, represented among others a domestic concern which manufactured merchandise of the kind here involved, selling same "at wholesale only," for the manufacturer, to "wholesalers and to the retailer, but not to the consumer." He had been familiar with the merchandise for "over 40 years" and had been selling it or was familiar with the selling of it by his company's salesmen "for 20 years" or over. His company, at the request of the manufacturers, issued circulars which were "sent out to prospective customers, soliciting orders for the goods * * * throughout the United States." One of these circulars was filed as an exhibit and its pertinent recitals have been heretofore stated.

The witness also testified to his familiarity with ordinary sheep shears obtained by dealing in same, selling them at wholesale to wholesale hardware houses. Likewise he testified to dealing in clippers or clipping machines.

We quote verbatim some parts of his testimony:

Q. And does the term "sheep shears" as within your experience in the business indicate a hand device like that illustrated?

 * * * * * * *

The WITNESS. When sheep shears are spoken of, it is considered to be a hand tool.

 * * * * * * *

Q. Mr. Wiebusch, in your business, would a machine using the cutters and combs * * * be supplied on an order for sheep shears?

 * * * * * * *

A. We would not. Sheep shears are sheep shears, and a hand tool only.

The witness was asked numerous questions about animal clippers. In answer to one of these he stated:

The term "animal clippers" is not generally used in giving orders. We would get orders for sheep shears or horse clippers and sheepshearing machines. The word "animal clippers" is not familiar to me in connection with the ordinary trade custom.

A little further along in his direct examination Mr. Wiebusch said:

I would like to say again, in all my experience and correspondence, the expression animal cutter [clipper] is not customary in the trade. We speak of horse clippers and sheepshearing machines, but the name animal clipper——.

In the entire direct examination of this witness he was not asked a single question about the meaning of the word "blades" as same appears in the paragraph, and we do not find the word mentioned by him until the cross-examination was reached.

Such testimony as was then given about blades follows:

X Q. Have you ever heard the expression "blades" in your trade?—A. Yes, sir.

X Q. Is that a well-known and definite expression in the trade?—A. It is not the usual expression; it is exceptional.

X Q. Is well known?—A. It is known; it is exceptional and not regular.

X Q. I am going to ask you to answer my question, Mr. Wiebusch. When in the trade customers speak of blades, you know what they are speaking about, don't you?

\* \* \* \* \* \* \*

The WITNESS. I must inquire as to what kind of goods they are talking about.

X Q. Do you not generally in this trade, in this animal-clipping machines, or utensils or instruments, in limiting yourself to that particular business, when a customer speaks of blades, you know what they refer to?—A. As a matter of fact they don't do it. If they did, I would know what to send them.

X Q. Do you recall whether or not you have ever seen an order in which the word blades was used?—A. Not in connection with either horse clippers or sheepshearing machines.

X Q. In talking with customers you have heard the word blades?—A. I have in connection with toilet clippers.

X Q. What kind of clippers?—A. Toilet clippers, for human-hair cutting.

X Q. You have never heard the word blades used in connection with animal clippers?—A. I have heard it in connection with toilet clippers for human hair.

X Q. Not in connection with animal clippers?—A. No; not in connection with either horse clippers or sheepshearing machines.

X Q. Your concern imports all of the parts that are used on such animal cutting machines, clipping machines?—A. No, sir; we do not import any of them; we get them in this country.

X Q. The parts?—A. Yes, sir.

X Q. You testified you imported some of the items?—A. We import the hand sheep shears.

X Q. And do you import these blades?—A. We imported a few of them about 20 years ago, \* \* \* but that was only a small lot, and after our investigation we decided not to import them regularly and we have not done so since.

X Q. When you speak of the comb and exhibit, when you speak of that collectively, do you refer ever to that as sheepshearing blades collectively?—A. I have no recollection of ever using that expression in connection with them.

The witness was then asked a number of questions relative to the structure of the "hand pieces," "clipping heads," etc., of sheep-shearing machines and clippers or clipping machines, certain of the illustrations exhibited being referred to. He was asked about barber's clippers and stated that his company sold them also.

X Q. And you sell the cutters there, too?—A. Yes, sir.

X Q. And the same way you have always heard reference to those cutting parts as cutters in the trade?—A. Cutters and combs; yes, sir.

X Q. Did you ever hear any reference to those as blades?—A. I have heard reference to them as plates.

X Q. The first letter of that word was "p"?—A. Yes; plates.

X Q. Mr. Reporter, will you make sure of the spelling of that word? You have never heard them called blades?—A. I have no recollection of ever hearing them called blades.

The foregoing verbatim quotations embrace all the testimony of this witness relative to blades.

Appellee's second witness was Mr. E. S. Bartlett, who *"since 1924"* (italics ours) had been connected with a company which manufactured

and sold sheepshearing machinery and clippers for animals. He identified certain catalogues and circulars and the illustrations given therein. Such personal knowledge as the witness had of the business of the company with which he was connected at the time of testifying related to a period after the passage of the Tariff Act of 1922 and hence is not particularly helpful.

However, from 1914 to 1924 he was in the employ of the protestant in this case. He testified that in 1921 and 1922 that company "were manufacturers and sellers of sheepshearing machines"; that they sold "supply parts as well as the complete machines," supplying combs and cutters; that the machines were "sold as sheepshearing machines" and not "for clipping other animals; horses or mules"; that the company issued a small circular describing the machines, which circular was sent to members of an organization interested in sheepshearing machinery "in a good many of the western States."

Just what duties the witness had with the protestant company is not stated, and we have no way of determining what they were, except as same may be deduced from the statement, "I was connected with the company in manufacturing shearing hand pieces." This is quite indefinite, and he gave no specific testimony indicating that he had anything to do with sales, nor did he state any knowledge of how during that period of his employment the articles were designated in trade and commerce.

He was for many years prior to 1914 engaged in the work of shearing sheep and while so engaged used sheepshearing machines having parts very much like those involved. He stated that such parts were "then known as cutters and combs." Whether commonly so known or whether that was a trade designation he was not asked to state.

The cross-examination of this witness was largely devoted to an explanation of certain exhibits and developed nothing new or helpful upon the question of commercial designation. The redirect and recross-examination dealt with the period of his employment from 1924 up to the time he was testifying and so must be disregarded.

There is no reference to, nor evidence about, the word "blades" in that part of the testimony of this witness which relates to the period of 1922 and prior years.

The first witness called by the Government was Mr. Edward J. Albro, who for about 14 years had had charge of the harness division of one of the large mail-order houses of the United States. He testified that as such manager he had occasion to purchase in wholesale quantities merchandise such as was mentioned in one of the exhibits under the headings of "Clipping and shearing machine," "Sheep shear," "Lakeside clipper," "Knife," etc.

We have searched the record in vain to find where this witness was asked by either party how even his company bought and sold such

merchandise—that is, as to any personal knowledge upon his part of the trade name and trade usage. One question and answer in direct examination may be quoted:

Q. You purchased these combs and blades, also known as cutters, in wholesale quantities?—A. Yes, sir.

The witness did state that a certain item illustrated in an exhibit catalogue was "a plate for a horse-clipping machine" and that another was a "comb for a sheepshearing machine," and Exhibit I was identified as a "cutter," being "a part of a sheepshearing head."

At one point in the direct examination, after the witness had identified an item as a "comb for a sheepshearing machine," he was asked by Government counsel, "Are they known by any other name beside 'comb' " and answered, "The correct name, I understand, is comb."

Counsel for the protestant then objected to the question and answer, insisting "his catalogue speaks for itself, and the question of what he understands is not of interest to the court."

Justice McClelland. Yes; it must be from first-hand knowledge.
Mr. Kavanagh [Government counsel]. Exception.

From the foregoing it is our assumption that the only question and answer having anything approaching a specific reference to commercial designation within the personal knowledge of the witness, based upon anything save catalogue recitals, was eliminated from the record upon the objection of counsel for protestant. Nevertheless in the brief of protestant's counsel, filed before us, the answer of the witness is quoted in italics.

The question of error in its exclusion is not before us, and, as it stands, it has no very important bearing upon the issue, but same is quoted and referred to in order to illustrate the difficulties this court has had in sifting and analyzing the somewhat hazy testimony and the contentions in the case.

The testimony of the witness as to receiving orders for "sheepshearing blades" and how they would be filled was all given as in the present tense, that is, as of the time of the testimony in 1930. In the cross-examination the attention of the witness was directed to certain exhibit catalogues issued and in use prior to and about 1922, and there was testimony about the designation or names of certain articles, but this testimony did not reach the matter of how orders were *then* received or how they would have been *then* filled. In other words, it was not so framed as that it can be regarded as convincing commercial designation testimony.

The second and last witness called by the Government was Mr. M. W. McArdle, president of a company which is engaged in the manufacture of—

a great many articles, including machines for taking the wool off sheep and hair off horses and cattle, * * * and parts thereof.

At the time of testifying he had been with the company about 25 years and for 15 years prior to 1927 was in charge of sales. The company sold in wholesale quantities "over the United States and some countries abroad." We quote from his testimony:

Q. Is there any difference between a sheepshearing machine and animal clippers which are also known as clipping machines?—A. We do not make anything that is commonly called animal clippers. In order to simplify the ordering of them by our customers we have separated them into clipping machines and shearing machines. By shearing machines we mean sheepshearing machines and goatshearing machines. For clipping machines we usually refer to machines used for clipping horses and cattle; but regardless of that our customers frequently mix them up.

 \* \* \* \* \* \* \*

Q. Are sheepshearing machines animal clippers?—A. They are.

 \* \* \* \* \* \* \*

Q. Were they commonly, uniformly, definitely, and commercially so known in the trade, at and prior to September 21, 1922?—A. Animal clippers is a term that is hardly ever used in the trade. Clippers and shears are used; clipping machines and shearing machines, without any reference to the word "animal."

Justice McCLELLAND. You never heard the term "animal" used?

The WITNESS. No, sir. The term "animal" is never used.

The witness then explained the difference in size, formation, etc., of the articles used for shearing sheep and those used for animal clipping, and his direct examination continued:

Q. Mr. McArdle, are the terms "shearing" and "clipping" synonymous and interchangeable terms, so known and used in the trade, uniformly, definitely, and generally, at and prior to September 21, 1922?—A. One of the terms.

Q. Which is it; when you say "one of the terms," what do you mean?—A. Shearing and clipping.

Q. That is one of the terms only?—A. Part of the trade use one and part of the trade use the other.

Justice McCLELLAND. Just say what terms were used interchangeably.

The WITNESS. Shearing and clipping. Part of the trade would not use them interchangeably but would use them separately.

On cross-examination, referring to parts of clipping machines, the witness stated, "we do not" refer to those as blades.

X Q. And you do not refer to the combs and cutters in your sheepshearing machines as blades; do you, *in your catalogues?*—A. No. (Italics ours.)

Certain letters introduced as collective Exhibits K and L, purporting to show orders for goods such as are here at issue as "blades" and orders for grinding "blades" during the year 1929, were properly disregarded by the trial court because they threw no light on the trade practice and custom prior to and at the time of the passage of the Tariff Act of 1922.

We have been at some pains to set forth *in extenso*, and often verbatim, every shred of evidence in this record which seems to have the slightest legitimate bearing upon the question of commercial designation.

Our analysis of the evidence compels the conclusion on our part that the United States Customs Court fell into error in holding that a commercial designation different from common meaning was established.

It is elemental that to establish a commercial designation different from common meaning such designation must be shown to be *uniform*, *definite*, and *general* in the trade and commerce in the article throughout the United States.

Appellee failed to ask any one of the four witnesses a single question about uniformity, definiteness, or generality in the trade usage and custom. Government counsel did ask one question of the witness McArdle (quoted in full, *supra*), in which were the words "commonly, uniformly, definitely, and commercially." The answer did little to enlighten us upon commercial designation.

This court went so far in the case of *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916, as to suggest a formula which might be used framing questions in these commercial designation cases. We do not, of course, insist upon the formula being adopted verbatim, but whatever language or whatever idiom may be used to deduce it, there must be deduced satisfactory evidence to cover the meaning carried by the words so often used by this and other courts following many, many decisions of the Supreme Court of the United States—"uniform," "definite," and "general."

Moreover, no one of the witnesses was asked any question as to commercial practice or designation which elicited testimony extending beyond his own personal experience derived from sales by his own company. No one of them undertook to state the custom of the trade generally or outside his own immediate concern.

There is, in fact, a dearth of testimony about sales. The witness, Wiebusch, stated that his company *sent its circular* "throughout the United States" but said nothing of what *sales* it made throughout the United States. The witness, Bartlett, testified as to protestant, while he was in its employ, sending out its catalogue or circular to those interested in sheepshearing machinery in a good many of the Western States, but gave us no information as to any sales of the merchandise. The Government's witness, Albro, went no further than to tell of having purchased goods. He gave no evidence as to how, or under what names, his company actually bought them or how and where it sold them. Only Mr. McArdle mentioned sales "over the United States and some foreign countries," and he confined his testimony to such sales by his own company.

When we turn from the meager and insufficient testimony given by the witnesses of what their personal knowledge was to the relevant documentary evidence, we find the latter to consist of the catalogues and circulars already herein alluded to.

These are competent evidence, within well-known limits, but in order to be of value in establishing commercial designation the court must be supplied with more information concerning them and their assertions than is here given.

We have no proof whatever as to what proportion of the comb and cutter industry in the United States is represented by the concerns issuing these particular catalogues and circulars. The court below referred to the fact that in the exhibit catalogue of one of the companies the statement was made that—

To-day we make at least 80 per cent of the world's clipping and shearing machinery.

We do not think that this statement can be taken as competent evidence in a judicial proceeding of the truth of what it asserts. The president of that company was on the stand, and neither party saw fit to ask him any questions about the extent of his industry and nothing along this line was elicited from him except the general statement already quoted as to his own sales "over the United States and some foreign countries." But even accepting the catalogue statement as true it is entirely too general in respect to the character of the merchandise to be of any particular value upon the issue here, narrowed as it is to the tariff status of some particular combs and cutters.

This court has no actual knowledge as to the extent of this industry nor as to how many concerns are engaged in making and selling combs and cutters in the United States, nor is it such a matter as comes within the realm of judicial knowledge.

The brief for appellee recites that—

* * * counsel decided to subpœna the various manufacturers in the United States of the same character of merchandise, as it appeared that there were no importers of the articles, with the exception of his own client, who is located in Utah.

The only person called by appellee who might fit the description of a manufacturer was Mr. Bartlett, who was at the time of testifying in the employ of a manufacturing company. Mr. McArdle, the only actual head of any manufacturing company, was called by the Government. All their testimony material to the issue of commercial designation has been recited, *supra*.

Even if we were at liberty to assume that the greater percentage of the industry was represented by the witnesses whose testimony was taken we should still be unable to find that that testimony as given, taken in connection with the documentary evidence as presented, meets the requirements of the law as to proof of commercial designation.

The matter must, therefore, be determined upon the common meaning of the pertinent terms.

The case of *Sheldon* v. *United States*, 2 Ct. Cust. Appls. 109, T. D. 31657, arose under the Tariff Act of 1909. The merchandise involved therein was barbers' clippers. The said act of 1909 apparently made no *eo nomine* provision for barbers' clippers. They were there assessed by the collector as "manufactures of steel not specially provided for." The importer claimed them dutiable as scissors or shears under paragraph 152 of said act. This court, affirming a decision of the Board of General Appraisers (now the United States Customs Court), sustained the collector's classification, saying, among other things:

> We think the term "barbers' hair clippers" or "clippers" in common understanding has come to have as fixed a meaning in the English language, although perhaps not yet so generally used, because the clippers are not of so common use, as have the words "scissors" or "shears," * * *.
>
> The conclusion we reach is that the word "shears" as used in paragraph 152 does not include such articles as the hair clippers involved in this case * * *.

In *Sears, Roebuck & Co.* v. *United States*, 2 Ct. Cust. Appls. 329, T. D. 32055, which also arose under the Tariff Act of 1909, this court held that steel hair clippers used by barbers in cutting hair were not classifiable either directly or by similitude as machine tools and adhered to the classification sustained in the *Sheldon* case, *supra*.

The law, as declared in the two foregoing decisions, established the rule that "barbers' hair clippers" were not "scissors or shears" and that they were not "machine tools" in the sense of the Tariff Act of 1909.

Our attention has not been directed to any subsequent tariff laws which modified the rule so established, but the Tariff Act of 1922 provides *eo nomine* for barbers' clippers, animal clippers, etc., in paragraph 357, *supra*, along with sheepshears, scissors, and other shears, etc. It also provides for "blades for the same."

As the said act passed the United States House of Representatives it did not include "nail, barbers', and animal clippers." Those were added by an amendment of the Senate, and each seems to be new in the said act. We have been unable to find where in any act prior to that of 1922 they had been given *eo nomine* designations.

Our immediate concern here is with the common meaning of the terms "animal clippers" and "blades for same," as used in paragraph 357, *supra*. Under the doctrine of the *Sheldon* case, *supra*, we do not think the implements in which the imported articles are used may be classified as shears or as sheepshears. The articles themselves are not, therefore, blades for shears or sheepshears. The question is whether they are blades for animal clippers.

We feel constrained to hold that they were properly so classified. This seems to be an entirely reasonable interpretation. A sheep is an animal, and the combs and cutters at issue serve as blades to clip the fleece.

One of the definitions of "blade" given by Webster's New International Dictionary is:

The *cutting* part of an instrument; as, the blade of a knife or a sword. (Italics ours.)

The Standard Dictionary gives:

The flat *cutting* part of a knife, sword or other edged tool or weapon. (Italics ours.)

Knight's Mechanical Dictionary informs us that the term "blade"—

\* \* \* is applied to objects \* \* \* which *have the function* of knives or *cutters*. (Italics ours.)

It is true that pertinent dictionary definitions of "clipper" refer, in the main, to "instruments" or "machines" for clipping "hair." It is likewise true that in certain provisions of the tariff statutes relating to the tariff status of hair and wool, distinctions are made between the two, but broad dictionary definitions of "wool" are "short, thick hair" (Webster), and, "The soft and more or less long curly or crisped hair which is obtained from sheep and some allied animals \* \* \*" (Standard).

It seems most reasonable to conclude that the broad term "animal clippers," as used in paragraph 357, *supra*, was not intended to be limited, in its common meaning, to clippers for some particular animals but was intended to embrace clippers for all animals, including those used for clipping sheep.

It is virtually conceded that the parts used in clippers applied to cutting the hair of horses, dogs, and cattle (such parts corresponding to those at issue here) are blades for animal clippers and come within said paragraph 357.

Upon the record before us and for the reasons stated we think the collector properly classified the merchandise.

The judgment of the United States Customs Court is, therefore, *reversed.*